UNITED STATES, Appellee

v

ROBERT MARTIN, Private E-1, U. S. Army, Appellant

9 USCMA 568, 26 CMR 348

No. 11,053

Decided September 12, 1958

First Lieutenant William L. Garwood argued the cause for Appellant, Accused. With him on the brief were Colonel Edward M. O'Connell, Lieutenant Colonel W. H. Blackmarr, and Captain Arnold I. Melnick.

First Lieutenant Thomas M. Lofton argued the cause for Appellee, United States. With him on the brief was Lieutenant Colonel John G. Lee.

Lieutenant General Lewis Hershey, Director, and Colonel Daniel O. Omer, General Counsel, Selective Service System, on amicus curiae brief.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Supported by a board of review decision in another case,[1] the accused contends he was illegally inducted into the Army. His contention is based upon the fact that he attained only a score of nine on the Armed Forces Qualification Test at the time of his induction.

The accused was born in October 1934. In February 1953 he registered under the Universal Military Training and Service Act, 50 USC App § 451, et seq, with Local Board No. 8 of the Selective Service System in his home city of New Haven, Connecticut. In April 1953, he submitted to the Board a Classification Questionnaire which he represented was completed in his own handwriting and without assistance. In pertinent part, the accused indicated, by check marks in appropriate boxes and the insertion of words or figures where required by the questionnaire, he was unmarried; had no children or dependents; was unemployed and not a full-time student; had completed nine years of school; had no criminal conviction; and, finally, that he had not had recent medical attention, and, in his opinion, had no physical or mental condition which would disqualify him from service in the Armed Forces. In October

[1] United States v Landin, CM 396621, October 30, 1957.

1953, he was classified 1-A. In August 1955 he applied for voluntary induction. In accordance with instructions, he reported to an Army Examining Station in New Haven for a physical examination. The report of the medical examination shows he was rated "normal" on clinical evaluation of his physical characteristics and "acceptable" in regard to his mental condition. In section titled "Psychological and Psychomotor" appear the following:

"IPRT-28-X-1     A. A.
AFQT-3-9-V"

We are informed, and it is not disputed, that the symbols relate to the mental fitness of the accused. The first entry indicates the accused was administered the Individual Picture Recall Test and scored 28 out of a possible 30; the X-1 part of the entry means he was classified as "marginal literate." The entry immediately below stands for the Armed Forces Qualification Test Form No. 3,[2] and it shows that the accused attained a score of nine which put him in Class V, the lowest class. The last entry "A. A." means that the accused's

mental fitness was determined to be "Administratively Acceptable."

In October 1955, the local board sent the accused the customary "Greeting" which directed him to report for induction on November 14, 1955. A stamped entry dated November 14, 1955, in the "Interval History" section of the accused's medical report shows "No Change"; and the charge sheet in this case indicates the accused entered upon active duty on the same date.

It appears from the record that, after two separate periods of unauthorized absence for which he was tried and convicted by a special court-martial, the accused absented himself a third time on January 12, 1957. He remained absent until apprehended by an agent of the Federal Bureau of Investigation on July 18, 1957. He was brought to trial on a charge of desertion. He entered a plea of guilty to unauthorized absence and testified on the merits to establish that he did not entertain an intent to remain away permanently. Also introduced by the defense in connection with the merits was an extract from the accused's service record. The information contained therein is set out below:

"21.     SECTION IV—MENTAL TEST    IPRT–28–X–1    VA–18–AA

TITLE—FORM—SCORE    Does Registrant Meet Minimum    I  II  III  IV  V
                    Intelligence Standards [xx] Yes    Group         xx
AFQT–3–9              [     ] No (Check appropriate
                        group)

NOTE:   (Check one if appropriate)
      [   ] Administratively Accepted:   No Verification
      [ x ] Administratively Accepted:   Interview Verified"

The meaning of IPRT-28-X-1 and AFQT-3-9 has already been noted. The reference to VA-18-AA means the accused's qualification test was also scored against a check test called the Verbal Arithmetic Test and he scored 18 out of a possible 30 which is said to be "extremely high" for a Class V paper; the "AA" refers to administrative acceptance. The entry in the "NOTE" section means the accused was interviewed before determination of his

acceptability. The IPRT is a "phase" of the interview.

The court-martial acquitted the accused of desertion, but found him guilty of unauthorized absence for the period alleged, and sentenced him to a dishonorable discharge, total forfeitures and confinement at hard labor for one year. Intermediate appellate authorities affirmed, but the board of review mitigated the dishonorable discharge to a bad-conduct discharge.

The Universal Military Training and Service Act of 1951 provides for the registration and service of males be-

---

[2] We are advised that there were two test forms, 3 and 4, in use at the time of the accused's induction.

tween the ages of 18 and 26. That part of the Act which applies to this case is as follows:

"No person shall be inducted into the Armed Forces for training and service or shall be inducted for training in the National Security Training Corps under this title until his acceptability in all respects, including his physical and mental fitness, has been satisfactorily determined under standards prescribed by the Secretary of Defense: *Provided,* That the minimum standards for physical acceptability established pursuant to this subsection shall not be higher than those applied to persons inducted between the ages of 18 and 26 in January 1945: *Provided further,* That the passing requirement for the Armed Forces Qualification Test shall be fixed at a percentile score of 10 points." [50 USC App § 454 (a).]

Counsel have supplied us with excellent briefs and source references on the background of the statute. Many of the latter are the same, but they are used by the parties to reach opposite conclusions.[3] The accused maintains that the statute operates as an absolute limitation on the right of the armed services to induct certain persons into the armed forces. The Government, and the Director of Selective Service as amicus curiae, insist the provision is a restriction on the services to *prevent them from excluding* certain persons from induction. In our opinion, the history and the language of the Act support the latter view.

Passing over the early history of manpower drafts,[4] the Selective Service and Training Act of 1940, 50 USC App (1946 ed) § 301, provided that no person should be inducted into the armed forces until his physical and mental fitness for training and service had been "satisfactorily determined." The basis for the determination was left to the administrators of the Act. Initially, it was provided that no registrant would be inducted who lacked the ability of a fourth grade student to read and write English. Such persons were classified as "IV-F."[5] In the years that followed the outbreak of World War II and in the immediate post-war period, the standard was modified in various ways. The modifications are not important. Significant, however, is the fact that a very large percentage of the registrants was not inducted because the registrants could not meet even the lowest standards of mental fitness. *Selective Service in Wartime,* Second Report of the Director of Selective Service, 1941-42, page 231; *Selective Service and Victory,* 4th Report of the Director of Selective Service, 1944-1945 with A Supplement 1946-1947, pages 120, 121.[6] This factor became a pivotal point of consideration by Congress in drafting the Selective Service Act of 1948.

An examination of the hearings on the 1948 Act shows clearly that the public and Congress were disturbed by the large number of persons who were escaping the obligation of military service because of their inability to meet the mental standards. The services did not want to lower the standards. They believed it was dangerous to the individual himself and to those with whom he had to serve. Hearings before the Senate Committee on Armed Services, 80th Congress, 2d Session, pages 924, 925, 1000, 1001; Hearings before the House Committee on Armed Services, 80th Congress, 2d Session, on H. R. 6274, pages 6492, 6499. They were criticized for their views and they were charged with taking only the "cream of the crop." House hearings, supra, page

---

[3] We appreciate the ability and the thoroughness of counsel. The effort which they have exerted has considerably lightened our work.

[4] See *Backgrounds of Selective Service,* Special Monograph No. 1, Volume 1 (1947), pages 3–30.

[5] See *Physical Examination of Selective Service Registrants,* Special Monograph 15, Volume 1 (1947), page 113.

[6] It is also noteworthy that, notwithstanding they failed the prescribed tests, over 50,000 registrants were inducted on an administrative determination of their ability to train and serve satisfactorily. *Selective Service and Victory,* supra, page 142.

6493. The Senate accepted the military position and approved a bill which contained no provision for mental standards, thus leaving the matter to administrative discretion as it had been under the 1940 Act. However, the House added an amendment to the bill which in effect provided that the passing requirement for the General Classification Test would not exceed seventy points. House Report No. 2438, 80th Congress, 2d Session, page 46.

The General Classification Test was the test used to determine mental fitness of persons qualified to enter the armed services. It is important to note also that, at the time, it was the general practice of the Army to reject persons who scored less than 80 on the test. House hearings, supra, page 6493. It is manifest, therefore, that the House of Representatives did not completely accept the services' viewpoint. It concluded the standard could be lower than that which the services believed appropriate without running the risks described by military witnesses who had testified at the hearings. To be sure the services adhered to its determination, the House wrote the limitation into the Act. In effect, it told the services they could not demand of inductees a higher standard of mental fitness than that evidenced by a score of 70 on the then existing test. In the conference to resolve the differences between the Senate and House, the Senate acceded to the House amendment and it was enacted into law. 50 USC App (1946 ed), Supplement IV, § 454(c) (3), 62 Stat 607.

The test provision in the 1948 Act was not the result of a desire by Congress to exclude persons from the service. Rather it originated in a desire to increase the number of persons eligible for service. The final determination of acceptability was still left to the administrator of the Act, but he could not fix the mental standard of exclusion higher than Congress directed. But there was no express or implied limitation on the induction of persons who attained scores lower than that fixed in the Act. And, in fact, the services did not so construe the Act. They accepted, as they had under the 1940 Act, persons who failed to achieve a score of 70 on the test, but who nonetheless demonstrated they possessed sufficient mental ability for training and service.[7]

In January 1951, the Preparedness Subcommittee of the Senate Committee on Armed Services opened hearings upon a bill that eventually developed into the Universal Military Training and Service Act. Again there was criticism of the services. The criticism, however, was not directed against the practice of accepting inductees who did not meet the mental fitness standard. On the contrary, it was concerned with the same point that had disturbed the public and Congress in 1948, namely that many registrants were escaping service because they did not obtain the minimum score on the mental test. Particularly disturbing to Congress was the fact that the unavailability of these registrants compelled it to consider reduction in the age of the persons subject to service. Expressing the sentiment of the Senate Subcommittee is the following excerpt from a statement by Senator Lyndon Johnson:

"Much of the corrective action which, in my judgment, the people of the country want done could be done administratively. I feel, however, that the people want the reassurances of seeing it written into any bill reported by this committee.

"For that reason, I believe, that we must write three general safeguards into the bill and, on behalf of the chairman, I have asked the staff to confer with the Legislative Drafting Service and to have prepared for such action as the subcommittee may desire to take, if any, the following proposals:

"First, we must require that the standards of acceptability as regards

---

[7] We are informed by Government counsel that in the period from 1950 through April 1951 (the initial period of the Korean conflict) 15.1% of those inducted had failed the mental test, but were administratively accepted for service because it was considered they possessed sufficient mental fitness to meet the requirement for training and service.

mental and physical qualifications are adjusted so that a very considerable number—maybe as many as 100,000—our testimony has indicated at one time 150,000, and another time 75,000—but maybe as many as 100,000 men—now classified in IV-F are used." [Hearings before Senate Committee on Armed Services, 82d Congress, 1st Session, on S. 1, page 994.]

The hearings before the House Committee of the Armed Services show the same dissatisfaction with the large number of rejections on the ground of lack of mental fitness. A few abstracted remarks by Chairman Carl Vinson point up the dissatisfaction. He said:

"Well, now, what percent of intelligence do you think some of those Chinese and Koreans have who have been driving us back 250 miles?

. . . . .

"When a man can't read Latin and Greek, he can do a little fighting.

. . . . .

"Now, I think very seriously there has been too much liberality and too much just at first blush saying, 'This fellow gave his answer and he couldn't figure out the square root on the nebula hypothesis, so we will just turn him loose.'

"Now, we have to have men to defend this country. Let's have a law that gets men and not a law that tries to get them out of the service, because the defense of this country must be taken care of. As this draft bill is being administered and interpreted today, it is horrible to think we have only 600,000 men that can serve out of a pool of 7,957,000." [Hearings before House Committee on Armed Services, 82d Congress, 1st Session, on H. R. 1752, pages 91, 129, 130.]

At the time of the hearing the services had turned from the General Classification Test to the Armed Forces Qualification Test. The qualifying score on the latter test was 13, which was deemed the equivalent of 70 on the General Classification Test. House Report No. 535, 82d Congress, 1st Session,

page 17. Congress was informed that one out of five registrants failed to attain a satisfactory score. Senator Johnson called the figures "shocking." Hearings before the Senate Committee on Armed Services, 82d Congress, 1st Session, on S. 1, page 193. Representative Rivers observed that the situation was "scandalous," Hearings before the House Committee on Armed Services, 82d Congress, 1st Session, on H. R. 1752, page 285, and he expressed the opinion that many turned "loose" at the induction centers were "hiding behind this shield of so-called mental deficiencies." House hearings, supra, page 226. Representative Durham referred to a survey he had made of several draft boards in which he determined that a number of registrants who had one or more years of high school education had attained scores on the mental test ranging from one to seven. Both Congressional Committees were deeply concerned with cutting down on the number of persons kept out of the service because of failure on the mental test. They also explored various means of detecting those who deliberately tried to fail the test. Congressman Rivers demanded that the services "screen these people properly." See House hearings, supra, pages 285-286, 305-306, 329-330, 357-358.

The Senate Subcommittee was apparently satisfied with the assurance of the service in regard to the administration of the mental test. Senate Report No. 117, 82d Congress, 1st Session. The bill recommended to, and passed by, the Senate did not contain a mental test provision. The House, however, was more insistent. It passed a bill which "would have resulted in a General Classification Test score of approximately 40" in place of the 70 score provided for in the Act of 1948. House Report No. 535, 82d Congress, 1st Session, page 17. The differences were resolved in conference; out of it came the provision under consideration. The effect of the provision was to reduce by three the existing qualifying score for the Armed Forces Qualification Test; the reduction corresponded to a test score of 65 on the previously used General Classification Test. Thus, once

again Congress told the services it wanted more, not fewer, persons made eligible for induction.

In summary, the provision of the Universal Military Training and Service Act under consideration was intended to enlarge the number of persons called to actual service, and to eliminate the "scandalous" and "shocking" situation in which a substantial percentage of registrants were avoiding actual service because of failure on the administratively prescribed mental test. The language of the statute carries out the legislative purposes clearly and expressly. The basic standard for induction is left to the Secretary of Defense, subject to two qualifications: (1) He cannot make the physical standards for induction higher than those which prevailed in January 1945; and (2) he cannot require a score on the Armed Forces Qualification Test higher than ten. There is no limitation on the discretion of the Secretary in regard to the acceptance for induction of persons who satisfy him as to their physical and mental fitness, but who do not meet the normal standards for admission. We conclude that the accused's score of nine on the Qualification Test did not make him ineligible for induction. Cf. United States v Blanton, 7 USCMA 664, 23 CMR 128. Since it clearly appears that the accused was properly inducted, he was a person subject to military court-martial jurisdiction at all times important to the prosecution. Article 2(1), Uniform Code of Military Justice, 10 USC § 802.

The decision of the board of review is affirmed.

Judges LATIMER and FERGUSON concur.

UNITED STATES, Appellee